## SHOEMAKER v. DIGGES.

### REAL ESTATE AGENTS; COMMISSIONS.

An owner of property has the right to employ more than one broker to sell his property; to reserve the right to sell himself, and to pay such broker as shall close the sale with a customer; but, notwithstanding this, if a broker finds a customer with whom the owner closes the deal, and is the real procurer of the sale, he is entitled to his commissions. (Following *Bryan* v. *Abert,* 3 App. D. C. 180; *Block* v. *Ryan,* 4 App. D. C. 283; *Moore* v. *Breuninger,* 34 App. D. C. 86; and *Shinn* v. *Evans,* 37 App. D. C. 304.)

No. 2930. Submitted February 7, 1917. Decided March 6, 1917.

HEARING on an appeal from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action by

Note.—The question as to when real estate broker is considered as the procuring cause of the sale or exchange affected is discussed in notes in 44 L.R.A. 321; 23 L.R.A.(N.S.) 164; and 27 L.R.A.(N.S.) 195.

a real estate broker to recover commissions on the sale of land
for the defendant.                                        *Affirmed.*

The COURT in the opinion stated the facts as follows:

Daniel Carroll Digges as plaintiff below filed a declaration
with the common money counts against Louis P. Shoemaker,
claiming $6,332.50. The particulars of demand attached to
the declaration show the claim for a 5 per cent commission on
the sale for defendant to one Fulton Gordon of 50 acres of land
in the District of Columbia for $126,650. The pleas are non-
assumpsit and *nil debet.*

The bill of exceptions shows that one Charles E. Gannon tes-
tified that he was authorized by defendant to find a purchaser
for the 50 acres of land at $2,500 per acre; that he spoke to
plaintiff about the sale, who told him that he thought he had a
customer for it; price was explained to plaintiff; plaintiff on
next day took witness to see Fulton Gordon, who, he said, was
the purchaser contemplated; plaintiff presented the property to
Gordon, who inquired where it was; plaintiff pointed out the
location on a map on Gordon's wall; Gordon did not seem to
understand the location, and plaintiff suggested he would get
a plot of it; saw defendant the next day and told him plain-
tiff had taken the matter up with Gordon, and obtained a plat.
He said to defendant: "I suppose there is a commission of 5
per cent in this." Defendant replied: "Yes, the usual com-
mission of 5 per cent," and further, "I hope you can do some-
thing with it; have a try." Witness took the plot to Gordon
with plaintiff, and they talked about the price. Gordon said he
would not give $2,500 an acre, but made an offer of $1,500.
This was reported to defendant, who refused it, and said if he
did not get $2,500, he would raise the price. This was early
in March. Defendant said nothing about being in negotia-
tion with Gordon himself, and witness knew nothing of such ne-
gotiations. About the latter part of May witness heard the
property had been sold, and inquired of defendant, "Was it sold
to Gordon?" After talking with defendant he said he thought

it strange that defendant would sell to Gordon without plaintiff being aware of it. Defendant said: "No, it is for sale; anyone can buy it that has the money; I admit that I have been furnishing Gordon with a good deal of data in the last couple of weeks." Some time later we heard that the sale had been made by defendant. September 18, 1911, witness wrote defendant a letter saying he had had a talk with plaintiff, who was much concerned with the sale of his 50 acres to Gordon, and that naturally he expected a commission, to which letter there was no reply. Witness was not a real estate broker.

Plaintiff testified that he is a real estate broker, and knew Gordon; he knew in December, 1910, that Gordon would be in the market to purchase a suburban tract; knew Gannon, who asked him if he could find a purchaser for the 50-acre tract near Chevy Chase belonging to defendant. He took Gannon to see Gordon and they described the land; plaintiff pointed out to Gordon on the map the survey; the piece on the map was divided into a number of acres from 4 or 5 to 6 and 10, aggregating 50. They got the location, but not the lines of the tract. Gordon did not appear to know all the property. Nothing was said by Gordon of any dealing with defendant. Next day plaintiff went to Gordon's office with the blue print, showed it to Gordon and compared it with map on the wall. Gordon said, "I'll give you $1,500 an acre for this tract." Plaintiff tried to raise him to $2,500, but failed. Plaintiff saw defendant about May 4, and said: "You are aware of the fact that I have an offer of $1,500 from Fulton Gordon?" Defendant said, "Yes." Plaintiff asked if $2,500 was the least he would take, "or are you open to another offer?" Defendant said, "No; I am stiff on $2,500 an acre. Go ahead and get Gordon to go $2,500 an acre, and I will pay you a commission." Plaintiff went to see Gordon ten or twelve times and tried to raise him to $2,500, but was unable to get a better bid than $1,500; plaintiff went until sometime in June to see Gordon, when he was told by Gannon that the tract had been sold to Gordon. Gannon told him what he had heard of the sale in defendant's office, and plaintiff saw Gordon, who said he had closed the

deal with defendant. He wrote defendant his claim for commission, but received no reply.

On cross-examination he said that Shoemaker had employed him to find a purchaser for the land, and he had found one in Gordon.

At the conclusion of this testimony defendant moved for a verdict, which was refused, and exception taken.

Defendant introduced Fulton Gordon, who testified that he had developed District of Columbia property for eighteen or nineteen years; knew plaintiff for twenty years; is the purchaser of the tract; put up a deposit on the tract on June 29, 1911; before that he had direct negotiations with defendant for the sale of this land; this was eighteen months before; had known the tract for several years, and that it was for sale; that about four years before he had bought 30 acres from Glover and improved it and resold; two years later bought another 30 acres from Glover and improved and sold it; during the time was familiar with defendant's property, which was not far from the Glover tract; had it in mind as probable purchase; went all over it and studied the grades and how the streets would run, etc.; had negotiations with defendant for eighteen months; knew his price and tried to lower it; he recalled visit of plaintiff to him, who quoted the price, but he told him it was too high; reason he did not discuss the sale with plaintiff was that he had made up his mind to buy the property, but was trying to lower defendant's offer; before he bought he had the surveyor's office give him a sketch of how the land would subdivide and how many square feet be left after deducting streets and alleys; a few weeks before he made the purchase plaintiff came to him, but did not stay long; witness did not want to prolong the talk; did not want to tell plaintiff he was dealing with defendant, and did not tell him; had no recollection of the party describing the property on his wall map, or presenting a blue print of the same.

Defendant testified that he had been engaged as a real estate broker and in selling the land of his father's estate since 1876; the land in question was part of his father's estate; he adver-

tised this property for sale extensively; had known Fulton Gordon for twelve or fifteen years prior to 1910, and knew that he was one of the most successful operators in suburban real estate; took up with Gordon personally the subject of selling this tract while he was engaged in selling the Glover tract; Gordon said he would come around to buy the tract after a while; intended to get through with the other development in which he was engaged; finally he began to talk with plaintiff and was told he would have to pay $2,500 per acre; Gordon offered $1,500, but was declined; once, prior to March, 1911, he drove a distance with Gordon, who renewed his offer of $1,500; saw Gordon frequently afterwards, who would inquire if he had sold the property yet; he saw Gannon, and gave him a memorandum of this tract among others for sale; never had any other price than $2,500 per acre; thinks plaintiff came to his office after he had sold the property; there were a number of other brokers who had talked about the sale and to whom he had given the price, which was never less than $2,500 per acre; had offered the track to Gordon about fifteen months before; Gordon said he knew the property better than defendant did; had walked over it often.

Defendant's father's will was put in evidence, which constituted him trustee to sell his real estate with a commission of 3 per cent; defendant had a one-fourth interest in the estate.

At the close of the testimony defendant renewed his motion to direct a verdict, which was again denied and exception taken.

Defendant also asked the following instruction, which was refused and exception taken: "The jury are instructed that if they find from the evidence that the defendant was negotiating with the said Fulton R. Gordon for the purchase of the land in these proceedings mentioned, at the price at which the property was purchased, before the plaintiff attempted to interest said Gordon in the property, and that the said Digges did not influence said Gordon to purchase the property at the price stated, the verdict should be for the defendant."

The court then instructed the jury to this effect: The first question is, Did Mr. Shoemaker employ Mr. Digges to find

him a customer for this property? There is no question about the price at which it was held, $2,500.

There was nothing to do in the way of bringing Mr. Shoemaker to anything or to anybody. He stood there, as all the evidence shows, on his price of $2,500 an acre, and never varied from it. The point was to get somebody that would come to it.

Now, did he, through Mr. Gannon, employ Mr. Digges to get him a customer who would pay $2,500 an acre for this property? You will consider the evidence in the case pro and con, all the evidence on the part of the plaintiff, tending to show there was such an employment, and the evidence on the other side, tending to show the contrary. What is the fact about it? Was there that employment?

If there was, he did not make any exception of anybody; he did not say that will not apply to Mr. Fulton Gordon because I am negotiating with him, and you need not go near him. If there was any employment at all, upon the evidence in the case, it was a general employment to find him a customer who would take the property at that price.

It is not claimed that Gordon, up to that time, had ever evinced any willingness to take it at $2,500. He had always insisted that that was too much, although he said himself that he had made up his mind that he would have to buy the property.

Now if that was the employment, did Mr. Digges do what he was employed to do? Did he find a man to pay that price for it? No matter how well Mr. Shoemaker and Mr. Gordon knew each other, did he bring them together as seller and purchaser, in those relations, so that they, as the result of what Digges did, consummated the sale? Was he in that sense the procuring cause of this sale?

The evidence is conflicting. There is evidence on the part of the plaintiff tending to show that he was; evidence on the other side tending to show that he was not,—that the sale itself was not brought about in any degree by the efforts of Mr. Digges; that these negotiations had been running on for years and that the parties were in that frame of mind where they

were eventually bound to come together, and that the course of the two parties toward each other was not influenced or affected in any degree by any effort of Mr. Digges.

That is a question of fact for you. Which is the truth about it? If there was this employment, then was it fulfilled by Mr. Digges, and did he procure the customer who was ready and willing to take the property at the price named, and who did take it at that price? If the plaintiff has made out his case upon that theory, then he is entitled to recover.

Further, he says that he went to the defendant and told him he was having these negotiations with Mr. Gordon; that Gordon had offered $1,500, and he asked Mr. Shoemaker if he stood firm at $2,500; Shoemaker said, "Yes, I know he has offered $1,500, but I will not budge from $2,500, and you go back and get to work and get him to pay $2,500, and you shall have your commission."

Now, was that said? That is the first question. Defendant says he never had any talk with Digges about it; that Mr. Gannon did come to his office six or seven times, but he never had any talk with Mr. Digges. What is the truth about it? That is a question of fact for you. You have to decide it, no matter how unpleasant it may be. Which are you satisfied, from all the evidence in the case, is telling the truth about it? Did that conversation occur? If it did not, then you have nothing to do with this branch of the case at all.

But if that talk was had, then did Mr. Digges fulfil that condition? Did he go back and follow up Gordon, as he claims he did, until Gordon was ready and willing to come up to $2,500, and did he as a result of his, Digges' efforts, come up to that price? If he did, then he has earned this money, he has earned his commission. That is a question of fact for you.

It would not make any difference with his right to recover that Gordon and Shoemaker closed the trade between themselves without any reference to Digges,—ignoring him,—if the plaintiff has proved all that. That would not cut Digges out of his right to recover, if he got Mr. Gordon ready to pay the $2,500, and if that was the result of his efforts.

The court submitted these issues to the jury, stating that the burden is upon the plaintiff to make out by a fair balance of testimony that he is entitled to recover upon one or the other of these theories.

The jury returned a verdict for the plaintiff, and, a motion for new trial having been overruled, judgment was entered therefor, from which defendant has appealed.

The death of the appellant has been suggested, and his executor has been substituted in his stead.

*Mr. Wm. G. Johnson,* for the appellant, in his brief cited:

*Addison* v. *Blair,* 42 App. D. C. 331; *Cissell, T. & Co.* v. *Hayden,* 41 App. D. C. 447; *Crowe* v. *Trickey,* 204 U. S. 228; *Daniel* v. *Land Co.* 9 App. D. C. 483; *Evans* v. *Shinn,* 40 App. D. C. 557; *Illingsworth* v. *Slosson,* 19 Ill. App. 612; *Jones* v. *Adler,* 34 Md. 440; *Mannix* v. *Hildreth,* 2 App. D. C. 259; *Moore & Hill* v. *Breuninger,* 34 App. D. C. 86; *Satterthwaite* v. *Vreeland,* 3 Hun, 152; *Sibbald* v. *Bethlehem Iron Co.* 83 N. Y. 378; *Wylie* v. *Marine Nat. Bank,* 61 N. Y. 415.

*Mr. Peyton Gordon* and *Mr. Henry H. Glassie,* for the appellee, in their brief cited:

*Abert* v. *Bryan,* 3 App. D. C. 180; *Addison* v. *Blair,* 42 App. D. C. 331; *Barnes* v. *Alexander,* 232 U. S. 117; *Cissell-Talbot Co.* v. *Hayden,* 41 App. D. C. 447; *Daniel* v. *Land Co.* 9 App. D. C. 485; *Davis-Fisher Co.* v. *Hall,* L.R.A.1915A, 1224; *District of Columbia* v. *Duryee,* 29 App. D. C. 327; *Hoadley* v. *Savings Bank,* 71 Conn. 599, L.R.A. 321; *Illingsworth* v. *Slosson,* 19 Ill. App. 612; *Jones* v. *Adler,* 34 Md. 440; *Lincoln* v. *McClatchie,* 36 Conn. 136; *Mannix* v. *Hildreth,* 2 App. D. C. 259; *Moore & Hill* v. *Breuninger,* 34 App. D. C. 86; *Quock-Ting* v. *United States,* 140 U. S. 417; *Satterthwaite* v. *Vreeland,* 3 Hun 152; *Schlegal* v. *Allerton,* 65 Conn. 260; *Sibbald*

v. *Bethlehem I. Co.* 83 N. Y. 378; *Simms v. Booth,* 42 App. D. C. 263; *Slater v. Hamacher,* 15 App. D. C. 558; *Slye v. Guerdrum,* 9 App. D. C. 550; *Ubhoff v. Brandenburg,* 26 App. D. C. 3; *Wylie v. Marine Nat. Bank,* 61 N. Y. 415.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

It is the law that an owner of property has the right to employ many brokers, and to reserve the right to sell himself, and to pay such broker as shall close the sale with a customer; but, notwithstanding this, if a broker finds a customer with whom the owner closes the deal, and is the real procurer of the sale, he is entitled to his commissions. *Bryan v. Abert,* 3 App. D. C. 180, 187; *Block v. Ryan,* 4 App. D. C. 283, 286; *Shinn v. Evans,* 37 App. D. C. 304, 308; and *Moore v. Breuninger,* 34 App. D. C. 86, 91.

This question of fact was submitted to the jury in a charge that we find unobjectionable. The jury found that the purchaser was not procured by the defendant, but by plaintiff, who stimulated him to the purchase and was the procuring cause of his offer. They found that defendant did not notify plaintiff of any previous negotiations with Gordon, nor reserve the right to effect a sale to Gordon himself. Plaintiff was left to believe that he had found the purchaser.

This was a question of fact for the jury to determine, and there was no error in refusing to direct a verdict for defendant, or in failing to give the special instruction asked by the defendant.

The judgment is affirmed with costs. *Affirmed.*